UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 14-10502-RGS

CONTESSA FINCHER

v.

EMD SERONO, INC.

MEMORANDUM AND ORDER ON DEFENDANT EMD SERONO'S
MOTION FOR SUMMARY JUDGMENT

October 5, 2015

Plaintiff Contessa Fincher brought parallel federal and state causes of action against her former employer, defendant EMD Serono, Inc. (EMD Serono), under the Massachusetts Anti-Discrimination Law, Mass. Gen. Laws ch. 151B (Count I), and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Count II).   Fincher alleges that EMD Serono discriminated against her by terminating her because of a severe depressive disorder, and by failing to offer reasonable accommodations[1] for her disorder prior to her termination.   EMD Serono seeks summary judgment on all

---

[1] Fincher does not argue that EMD Serono failed to provide the accommodations that she in fact requested; Fincher's Complaint alleges only that EMD Serono failed to offer her additional accommodations she had *not* expressly requested.

counts of Fincher's Complaint.  EMD Serono maintains that it had good-faith reasons to terminate Fincher's employment and that Fincher has provided no evidence to substantiate her claims of discrimination.   EMD Serono further asserts that it provided Fincher with every accommodation which she requested.  A hearing on the motion was held on September 29, 2015.

BACKGROUND

EMD Serono hired Fincher in April of 2007 as an at-will employee. From 2007 to 2012, Fincher worked as a telecommuting member of a small team of four employees led by her direct supervisor, Dennis Meletiche. Fincher's job description was Senior Manager, Regional Outcomes and Market Access, for the Western United States.   Fincher remained in this position for the duration of her employment at EMD Serono.  Though EMD Serono is headquartered in Boston and her assigned region included the Western states, Fincher received permission to work remotely out of Chicago, Illinois. Fincher subsequently moved to Ann Arbor, Michigan; to Austin, Texas; and back to Ann Arbor, all while remaining in the same position at EMD Serono.  Fincher testified that other employees had similar work arrangements.

As  Fincher's  direct  supervisor,  Meletiche  was  responsible  for evaluating Fincher's performance and providing her with feedback, written

and oral, which he did at least twice annually.  The parties disagree on their assessment of Fincher's performance reviews.  EMD Serono characterizes Fincher's performance, from 2007 through 2010, as mostly "average," while Fincher's Opposition maintains that her performance was "excellent" and her reviews "very good".  Def.'s Statement of Undisputed Facts (SOF) at 3; Opp'n at 1-2.  From 2007 to 2010, Fincher's written performance reviews reflect four ratings of "Exceeds [Objectives]," one rating of "Work Required," and fourteen ratings of "Meets [Objectives]."  Meletiche Aff. Exs. B-E.

EMD Serono argues that Fincher's performance began to deteriorate in early 2011.  Fincher's 2011 mid-year review was more critical than her previous evaluations, noting "a number of performance issues related to communication, organization, and project management."  Meletiche Aff. Ex. F.  The review stated that one of Fincher's major objectives was "significantly behind plan," that Fincher "needs to focus on improving her execution," and "needs to focus more on keeping her . . . colleagues up to date on the status of tools."  *Id.*  The review also stipulated that Fincher "need[ed] to be more proficient in SAP[2] and be more vigilant about missing receipts.  She also

---

[2] Although not fully explained in the record, SAP appears to be proprietary software for managing business operations and customer relations.

needs to stay on top of her calendar." *Id.* Fincher received her mid-year performance review on July 21, 2011.

On August 15, 2011, Meletiche sent a detailed email to Fincher listing a series of "fundamentals" which he believed "necessary to meet the expected level of performance for your current role, but also essential for any other role." Corvini Aff. Ex. A, Part 2 at 51. Meletiche's email stated that he had discussed "the fundamentals" during Fincher's mid-year performance review, and that he was writing to insure "complete clarity on my expectations." *Id.* Meletiche's email instructed Fincher to "stay on top of her calendar" and keep it up to date; to notify Meletiche when Fincher required vacation time or other time off; to keep use of rental cars on business trips to a minimum and to refrain from using rental cars for sightseeing; to book company travel a week or more in advance in order to save the company money;  to keep promotional materials and tools up to date; to follow up on communications consistently and in a timely fashion; to take ownership of her top priority projects; to maximize the amount of work done during downtime while traveling on business; and to complete compliance courses in a timely fashion. Meletiche noted that he had not included "the issues around effective communication" in his email since they had been discussed at length during Fincher's mid-year evaluation. *Id.*

In August of 2011, Fincher was diagnosed with severe anxiety and depression, for which she was subsequently treated.  Fincher states that her diagnosis for severe anxiety occurred on August 12, 2011, while her diagnosis for depression came on August 18, 2011.  Sometime after that date, Fincher informed Meletiche of her diagnoses, which elicited the alleged response, "Oh shit . . . do what you have to do to take care of yourself."[3]  Opp'n at 20-21.

Fincher subsequently took twelve weeks of short-term disability leave pursuant to the Family and Medical Leave Act (FMLA).  EMD Serono granted her request to extend her leave by an additional week, and also gave her permission to relocate from Texas to her former home in Michigan.[4]  Fincher returned to work on December 11, 2011.  She agrees that her short-term disability benefits were "excellent" and that in this regard EMD Serono treated her "fairly."  Fincher did not share with EMD Serono the details of her treatment plan.  Nonetheless, EMD Serono permitted Fincher to attend doctor's appointments freely during work hours.   FMLA leave and

---

[3] Fincher's counsel maintains that this remark indicated Meletiche's recognition of the seriousness of Fincher's condition, which caused Meletiche to embark on a campaign to terminate her.

[4] Fincher disputes EMD Serono's characterization of the permission for her to change job locations as an "accommodation."

permission to schedule doctor's appointments during work hours were the only formal accommodations Fincher requested of EMD Serono.

Fincher received her 2011 year-end performance review in January of 2012. Fincher's comments to the review reflect her belief that she had resolved all of the issues identified in Meletiche's August email. Meletiche's written comments essentially repeat his remarks in the July review, which EMD Serono attributes to Fincher's being absent on leave from September to December 2011. Fincher's "Overall" grade for 2011 was "C," which corresponds to "[p]artially met . . . expectations/requirements." Meletiche Aff.-Ex. H.

Meletiche and EMD Serono assert that Meletiche conducted an oral review warning Fincher of ongoing concerns regarding her performance. Fincher claims in her Opposition that Meletiche "lied" in his affidavit about holding an in-person meeting to discuss her year-end review, but acknowledged in her deposition that she did not recall the meeting, and that it "could have happened." Fincher Dep. at 288.

On January 6, 2012, Fincher emailed Meletiche to discuss the ongoing approval process for two of the marketing tools for which she was responsible. Fincher wrote that one of the tools, the Growth Hormone Analyzer, was "approved for use for 2012," but that a "minor change on 1

slide" was needed.  She wrote that the timeline for this change was "2 weeks from today."  For another tool, the Waste Calculator, Fincher wrote that the timeline was "2 months to PSMR [Promotional and Scientific Material Review] review."  Dkt. #43 – Meletiche Aff. Ex. I.

In February of 2012, Fincher was hospitalized for one week for mental health-related issues.  Fincher informed EMD Serono that she was out sick, but did not report her hospitalization as related to her previous mental health condition, nor did she request an accommodation.  Through February and March 2012, Fincher continued to miss deadlines on several projects and administrative tasks, and was late in attending two conference calls.  Fincher testified that it was not uncommon for EMD Serono employees to be late for such calls.

On March 15, 2012, Fincher booked air travel for a meeting with a customer in Boise, Idaho.  The meeting was scheduled for Tuesday, March 20, but Fincher booked a weekend flight through Minneapolis, Minnesota.  Fincher claimed that the flight was cheaper than a direct flight, and that by flying through Minneapolis she would be able to meet with a fellow EMD Serono employee, Angela Justice, to review a training slide deck.  Justice was also a personal friend of Fincher's, with whom she planned to stay while in Minneapolis.  Meletiche approved the trip.

Prior to the trip, Fincher's meeting in Boise was canceled.  Fincher does not recall notifying Meletiche of the cancellation, and Meletiche attests that he did not learn that the meeting had been canceled until two weeks later. Fincher chose nonetheless to fly to Minneapolis.  Fincher stayed with Justice over the weekend and the two shared dinner at a Thai restaurant.[5]  Fincher and Justice reviewed training slide decks on the subsequent Monday.

On March 28, 2012, Meletiche discovered that the two marketing tools for which Fincher was responsible had not yet been approved through EMD Serono's PSMR process, despite Meletiche's belief that Fincher had represented in her January 6, 2012 email that one of the projects had been approved and that the other would be shortly.[6]

On March 29, 2012, after learning that Fincher had traveled to Minneapolis despite the cancellation of the customer meeting, Meletiche emailed Fincher expressing his disapproval.  Meletiche wrote that "[y]ou know very well that slide training for field personnel is typically done via webcast and there have been several opportunities for training. . . . Clearly,

---

[5] Fincher denies that she socialized with Justice over the weekend. Justice, however, stated in her deposition that she did socialize with Fincher over the weekend, and characterized the "weekend part" as "a little bit more social built around a business trip."  Justice Dep. at 41.

[6] Fincher contends that the tools had been verbally approved, but conceded that she did not know whether they were fully approved.

this is a very inefficient and expensive way to provide training for slides that were not even intended for our team."   Corvini Aff. Ex. A, Part 2 at 57. Meletiche concluded that the trip was "not justifiable and . . . yet another serious action inconsistent with the level of judgement and performance that is expected from you." *Id.* Meletiche attests that he would not have approved the trip had he been told of the client's cancellation of the Boise meeting, and that he believed then, and now, that Fincher traveled to Minneapolis so that she could spend the weekend with a friend at company expense.

On March 28, 2012, Meletiche wrote to EMD Serono's Human Resources Director recommending Fincher's termination.  Fincher received notice of the recommendation on March 29, 2012.  EMD Serono terminated Fincher on April 4, 2012. Fincher subsequently obtained employment at Teva Pharmaceuticals, where she remains employed.  Fincher filed this action on March 5, 2014.

## DISCUSSION

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The initial burden of establishing that no genuine issue

9

of material fact exists is borne by the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The record must be analyzed in the light most favorable to the nonmoving party, with all reasonable inferences drawn in the nonmovant's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

However, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must plead "specific facts sufficient to deflect the swing of the summary judgment scythe." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 248.

In order to establish a prima facie case for disability discrimination under the burden shifting formula of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Fincher must prove that she "(i) has a disability within the meaning of the Act; (ii) is qualified to perform the essential functions of the

job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by [EMD Serono], (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result." *Jacques v. Clean-Up Grp., Inc.*, 96 F.3d 506, 511 (1st Cir. 1996) (internal citations omitted).  The parties dispute whether Fincher has made a prima facie case of discrimination, particularly regarding whether she has made a showing that she was able to perform the essential functions of her job with or without an accommodation.  While the issue is a close one, the court will proceed under the *McDonnell Douglas* framework as the issue of job performance is the same whether analyzed under the aegis of Fincher's prima facie case or as part of the third stage of burden-shifting.

With regard to the second stage of *McDonnell Douglas*, "[t]he employer's burden of articulating a non-discriminatory reason is only a burden of production, not a burden of persuasion; the burden of proving unlawful discrimination rests with the plaintiff at all times." *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99-100 (1st Cir. 2007) (internal citations omitted).  EMD Serono has offered two explanations for Fincher's termination, both of which easily satisfy its burden of production; namely that Fincher was fired because of a deteriorating job performance, and that

she was fired because of her exercise of poor judgment and misuse of company funds in traveling for the weekend to Minneapolis in March of 2012.

The issue therefore is whether EMD Serono's proffered reasons for Fincher's termination are pretextual, as Fincher contends.  Fincher finds pretext in EMD Serono's "reevaluation" of her "very good" performance reviews and relates this to Meletiche's learning of her mental health disability.  Pl.'s Opp'n at 2, 17.  The argument misses the mark for two obvious reasons.  First, even if Fincher's generous characterization of her pre-2011 performance evaluations is accurate, both Fincher's 2011 mid-year performance review and Meletiche's follow-up email of August 15, 2011 emphasizing the need for substantial improvement on her part, predated her diagnosis for depression and request for FMLA leave.  Fincher herself admits that she had "start[ed] slipping" in 2011, while faulting EMD Serono for failing to afford her a sufficient "chance to get back up to be a top performer." Fincher Dep. at 221-223.[7]

---

[7] Fincher's speculation that Meletiche, as a trained pharmacist, might have had the medical insight of a Dr. Gregory House, and the ability to diagnose her prior to August 18, 2011 as suffering from severe anxiety and depression by observing her demeanor and weight loss, even before she herself became aware of her condition, does not suffice to raise a dispute of material fact for Rule 56 purposes.

Second, there is no material dispute about the facts surrounding Meletiche's determination that Fincher had exercised bad judgment and misused company resources in traveling to Minneapolis for mostly personal reasons. While it might reasonably be debated whether Fincher's decision to make the trip was sufficiently egregious to warrant her termination, that is not the issue.[8] An employer may act entirely irrationally toward its employees, provided the reasons for so doing are not discriminatory. "Courts may not sit as super personnel departments, assessing the merits--*or even the rationality*--of employers' nondiscriminatory business decisions." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 825 (1st Cir. 1991) (emphasis added).

This, of course, does not end the case. A plaintiff has the both the burden and the opportunity to "adduce sufficient evidence to support a finding that [the employer's] stated [and facially legitimate] reason [for an adverse job action] was not only a pretext, but that it was a pretext for illegal . . . discrimination." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir.

---

[8] EMD Serono argues, with support in the case law, that the travel incident itself was a sufficient basis for Fincher's termination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision."); *see also Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 859 (1st Cir. 2008).

13

1994).   The only direct evidence that Fincher offers of a discriminatory animus on Meletiche's part is his alleged statement, upon learning of Fincher's diagnosis, "Oh shit . . . Do what you have to do to take care of yourself."  The statement is at best ambiguous (it might be interpreted as one of surprise and sympathy, or, as Fincher would have it, as displeasure at the thought that accommodation of her condition might adversely impact her job performance).  But it is well established that a "stray remark," by itself (even where unambiguous) is insufficient to defeat summary judgment.[9]  *Ruiz Rivera v. Pfizer Pharm.,* LLC, 521 F.3d 76, 87 (1st Cir. 2008).

Fincher's alternative argument is that she was denied reasonable accommodations for her condition by EMD Serono.  The short answer is that Fincher has failed to identify any accommodation that she *requested* from EMD Serono that was denied.  Fincher's Complaint alleges that EMD Serono failed to *offer* accommodations, but *sua sponte* offers to accommodate an

---

[9] The argument of plaintiff's counsel at the hearing of the motion that temporal proximity between the disclosure of her mental health problems and her termination is alone sufficient to establish pretext has little support in the cases. *See, e.g., Ponte v. Steelcase Inc.,* 741 F.3d 310, 322 (1st Cir. 2014) ("[C]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'"), quoting *Wright v. CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003).

employee's disability are not required by the ADA.  *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001).

The court understands that in an employment discrimination case, the question of the employer's intent or motive is generally one for the jury.  *See Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 30 (1st Cir. 2015); *Mulero-Rodríguez v. Ponte, Inc.,* 98 F.3d 670, 677 (1st Cir. 1996). Nonetheless, as the First Circuit has noted, "[e]ven in an employment discrimination case, where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 13 (1st Cir. 1994) (internal citations and quotation marks omitted).

Such is the case here.  Essentially, Fincher asks the court to pile inference upon inference in order to conclude that her job performance was excellent rather than average; that Meletiche determined her medical condition before she was in fact diagnosed, and began to blaze a paper trail in order to justify her termination; that the incidents cited by Meletiche as examples of misconduct or deteriorating performance were immaterial; that her work performance did not deteriorate despite the evidence to the contrary in her performance reviews; that she was perfectly justified in

15

taking the Minneapolis trip; and that the trip did not itself constitute grounds for termination.   These are all arguments that may impugn the *reasonableness* of the employer's decision.   They do nothing, however, to establish that the termination decision, even if manifestly unreasonable (which it would not appear to have been) was motivated by a discriminatory animus.

For the same reasons, Fincher's discrimination claims under the Massachusetts Anti-discrimination Statute, Mass. Gen. Laws ch. 151B, also fail.   The Massachusetts legal standard for evaluating such claims is substantially the same as that under federal law.  *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 n.5 (1997); *Garrity v. United Airlines, Inc.*, 421 Mass. 55, 59 (1995).

## ORDER

For the foregoing reasons, EMD Serono's motion for summary judgment on Counts I and II is <u>ALLOWED</u>.  The Clerk will enter judgment for EMD Serono and close the case.

SO ORDERED.

/s/ Richard G. Stearns

UNITED STATES DISTRICT JUDGE